# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MELVIN CENTENO (K72719),<br>　　　Plaintiff,<br><br>　　　　　v.<br><br>WEXFORD HEALTH SOURCES INC.,<br>ARTHUR FUNK, IMHOTEP CARTER,<br>PARTHA GHOSH, and LIPING ZHANG,<br>　　　Defendants. | No. 11 C 700<br><br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

Plaintiff Melvin Centeno, who is in custody at the Stateville Correctional Center, filed this pro se civil rights action pursuant to 42 U.S.C. § 1983 based on his dissatisfaction with the care he received for chronic pain in his left knee. In February 2013, Centeno received knee replacement surgery. He contends that Wexford Health Sources (an entity that hires personnel who provide medical services to Illinois prisoners) and Arthur Funk, Imhotep Carter, and Liping Zhang (three doctors employed by Wexford) were deliberately indifferent to his serious medical needs because they delayed his surgery and provided constitutionally inadequate care beforehand. Defendants now move for summary judgment pursuant to Fed. R. Civ. P. 56. For the following reasons, their motion is granted.

## BACKGROUND

### A.　Local Rule 56.1

Because Centeno is proceeding pro se, the defendants served him with a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment," as required by Local Rule 56.2. (Dkt.

138.) This notice explained the consequences of failing to properly respond to a motion for summary judgment and statement of material facts.

Local Rule 56.1(a)(3) requires a party moving for summary judgment to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (citing L.R. 56.1(a)(3)). Under Local Rule 56.1(b)(3), the nonmoving party then must submit a "concise response" to each statement of fact, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B). The nonmoving party may also present a separate statement of additional facts that requires the denial of summary judgment. *See* L.R. 56.1(b)(3)(C); *see also Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008).

Because Centeno is proceeding pro se, the court will construe his filings liberally. *See Ambrose v. Roeckeman*, 749 F.3d 615, 618 (7th Cir. 2014). Nevertheless, a plaintiff's pro se status does not excuse him from complying with federal and local procedural rules. *See McNeil v. United States*, 508 U.S. 106, 113 (1993). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by [Local Rule 56.1], those facts are deemed admitted for purposes of the [summary judgment] motion." *Cracco*, 559 F.3d at 632. Thus, district courts disregard Local Rule 56.1 responses that do not cite specific portions of the record or that contain irrelevant information, legal arguments, conjecture, or evasive denials. *See id.*; *see also Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006); *Bordelon v. Chi. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000).

2

In his response to the defendants' Local Rule 56.1 statement, Centeno largely directs the court's attention to relevant evidence that supports his position. However, to the extent that his denials are unsupported or unresponsive, the corresponding facts are deemed admitted insofar as they are supported by the record. With this in mind, the court turns to the facts.

**B.    Relevant Facts**

Centeno was born in 1963 and is incarcerated at the Stateville Correctional Center. Wexford Health Sources hires medical personnel who provide medical services to Illinois prisoners. Dr. Funk is Wexford's regional medical director. Despite Centeno's unsupported assertion to the contrary, the record shows that Dr. Funk does not oversee daily operations at Stateville's Health Care Unit. Dr. Ghosh was Stateville's medical director from 2006 through March 31, 2011, when he retired. Dr. Carter was a Wexford physician at Stateville during the relevant time, and served as Stateville's medical director from July 25, 2011, through May 10, 2012. Dr. Zhang was another Wexford physician who worked at Stateville from May 3, 2008, to June 28, 2010.

**1.    The 2008 Lawsuit**

Centeno filed a lawsuit in 2008 regarding treatment he received in Stateville for his left knee. In that case, Centeno alleged that from 2006 to 2008, orthopedic specialists told him that he needed knee surgery. He also alleged that the defendants failed to provide him with a prescription knee brace or appropriate pain medication. On June 17, 2009, Centeno settled the 2008 case. The release in that case covered "any past or future injuries or claims of injuries known or unknown to [Centeno's] left knee which arose or could have arisen from the subject

3

matter of **08 CV 2756**, currently pending in the United States District Court for the Northern District of Illinois." (Dkt. 137-8 at 1) (emphasis in original.)

In 2011, Centeno filed the case that is presently before the court. He named Wexford, the Illinois Department of Corrections ("IDOC"), and various Wexford and IDOC staff as defendants. As in the 2008 lawsuit, Centeno alleged that he did not receive necessary knee surgery and challenged the care he received for his knee.

**2.      Treatment Provided at Stateville for Centeno's Knee**

Centeno was treated in Stateville's health care unit twenty times between 2008 and the filing of this lawsuit. As Centeno correctly observes, not all of these appointments addressed his knee issues. Although the records are frequently difficult to read, it appears that fifteen of these visits did so. Specifically, Centeno saw Stateville staff about his left knee on September 15, 2008, February 2, 2009, February 4, 2009, September 24, 2009, October 28, 2009, December 14, 2009, July 27, 2010, August 9, 2010, January 10, 2011, January 12, 2011, January 13, 2011, April 5, 2011, July 19, 2011, September 26, 2011, and October 6, 2011. In addition, a February 21, 2011, appointment appears to have indirectly addressed Centeno's knee, as on this date, Dr. Ghosh approved an order stating that Centeno did not have to wear leg irons for an appointment at the University of Illinois at Chicago Medical Center ("UIC").

From 2008 through 2011, Centeno received a variety of special permits to accommodate his knee issues, including permits for a knee sleeve, a knee brace, a low bunk, a low gallery, and no stairs. On February 2, 2009, Centeno returned his knee sleeve, claiming it was too large. Two days later, Dr. Zhang gave Centeno a prescription for a DonJoy knee brace that duplicated a prescription for this brace written by another doctor in 2006 that Centeno had not received.

Centeno received a DonJoy knee brace in September 2009 as part of the settlement of the 2008 lawsuit.

Stateville medical records indicate that Dr. Ghosh evaluated Centeno on January 13, 2011. Dr. Ghosh ordered a left knee X-ray and authorized an evaluation at UIC. Centeno received an X-ray that same day, which showed that he had minimal degenerative joint disease. On February 22, 2011, Centeno received another X-ray of his left knee, which showed an old fracture of his lateral tibial plateau with minimal depression but no new pathology. In July 2011, Centeno received a renewal of his medical permit for accommodations relating to his knee.

The notes for Centeno's September 26, 2011, appointment quote him as affirmatively stating that he did not want any pain medications. Instead, the notes state that Centeno represented that he made that appointment so he could find out the status of his outside consultation. (Dkt. 137-10 at 13) ("'I don't want any pain meds, I want to see where my consult is status wise', 'I'm not here for any other reason.'").

On October 6, 2011, Centeno returned to Stateville's health care unit. Medical records reflect that Dr. Carter evaluated Centeno. Dr. Carter's notes state that Centeno requested a follow-up at UIC and incorrectly believed that he had been promised knee replacement surgery. Dr. Carter observed a normal gait and no apparent mechanical disturbance but indicated that Centeno complained about pain in his left knee. Dr. Carter believed Centeno's left knee was stable, but approved an outside hospital appointment for "collegial review." Centeno asserts that

Dr. Carter merely approved a "collegial review" appointment, refused to evaluate him, and told him that he was there to save money, not save lives.[1]

### 3. Treatment Provided at UIC for Centeno's Knee

Centeno also received treatment outside Stateville from UIC medical staff. On December 17, 2009, Dr. Mark Hutchinson and Dr. Hasan Baydoun evaluated Centeno's left knee. Centeno told the doctors that he had experienced ongoing left knee pain for several years based on a 2002 tibial and fibular fracture. Dr. Hutchinson reviewed Centeno's MRI and X-rays. He noted that Centeno had some mild laxity in the AP plane, very mild posterolateral rotation, and a crack in his lateral tibial plateau which had healed with a widened lateral tibial plateau. He found, however, that Centeno's medial collateral and posterior cruciate ligaments were intact.

During this appointment, Dr. Hutchinson discussed the risks and benefits of surgical and non-surgical options. He opined that posterolateral corner and posterior cruciate ligament reconstruction usually do not improve grade 1 laxity. He also indicated that Centeno should return as needed. In response, Centeno stated that he wanted to get a second opinion and that he "might be leaning towards the option of a total knee arthoplasty." (Dkt. 137-6 at 2.)

On October 21, 2010, Centeno returned to UIC and saw Dr. Hutchinson and Dr. Jeffrey Goldstein. The notes, which are partially illegible, indicate that Centeno had some posterior laxity in the AP plane, as well as mild posterior lateral rotation, but no significant "spin out." Dr. Hutchinson and Dr. Goldstein ordered updated imaging studies to determine if Centeno was

---

[1] Despite the defendants' claim that Centeno never filed a grievance about Dr. Carter (Dkt. 137-2 at 9), the record shows that on October 7, 2011, Centeno submitted a grievance complaining about Dr. Carter's treatment during the October 6, 2011, appointment. (Dkt. 141, Ex. 9). Given Centeno's current arguments, the court assumes that the grievance was unavailing. The court cannot ascertain whether Centeno appealed.

undergoing arthritic changes and gave Centeno prescriptions for glucosamine chondroitin sulfate, a DonJoy knee brace, and a neoprene knee sleeve. They also directed him to follow up after his imaging studies were complete.

According to articles submitted by Centeno, glucosamine and chondroitin sulfate help support healthy cartilage and some studies suggest they may benefit patients with osteoarthritis. (Dkt. 141, Exs. 5, 6.) Despite receiving prescriptions for glucosamine and chondroitin sulfate, Centeno did not receive these nutritional supplements. Centeno wore the knee brace he received from the 2008 settlement from the time he received it until the date of his surgery. He does not appear to have received a second knee brace pursuant to the 2010 prescription.

On November 18, 2010, Centeno had MRI studies done for his left knee at UIC. The MRI revealed arthritic changes of the lateral tibial plateau and slight to mild progression of the condition of Centeno's knee. On January 28, 2011, Centeno returned to UIC and saw Dr. Benjamin Goldberg. Dr. Goldberg's notes indicate that he recommended a steroid injection and that Centeno "verbalized that he would like surgical intervention" and "is most interested in total knee arthoplasty." (Dkt. 137-6 at 10.) Dr. Goldberg advised Centeno that he had other options, including a diagnostic arthroscopy with debridement (*i.e.*, the removal of tissue), and that he believed that Centeno was "very young for a total knee." (*Id.*) Centeno "still stated that he would like a total knee despite being explained the risks and the benefits." (*Id.*) Dr. Goldberg referred Centeno to Dr. Samuel Chmell at UIC for assessment, and Centeno told Dr. Goldberg that he understood and agreed with the doctor's assessment and plan.

On February 21, 2011, Dr. Chmell evaluated Centeno, along with Dr. Matthew Simons. Centeno's chief complaint was left knee instability. The medical records indicate that Dr.

Chmell concluded that a reconstructive knee replacement would be unlikely to be beneficial based on the existing images of Centeno's knee. He ordered new X-rays and directed Centeno to return to discuss the test results. Dr. Chmell also told Centeno that "he may potentially need a knee replacement." (*Id.* at 12.) According to Centeno, during this appointment, Dr. Chmell stated that he would not recommend surgery due to concerns about the type of physical therapy that Centeno would be able to receive afterwards at Stateville.

On March 21, 2011, Centeno returned for his follow up with Dr. Chmell, who was assisted by Dr. Michelle Cameron. Dr. Chmell reviewed Centeno's latest X-rays, which showed significant arthritis. Given Centeno's age, Dr. Chmell encouraged him to try conservative therapy, including exercise and injections, in an attempt to delay surgery as long as possible. Dr. Chmell's notes stated that Centeno should have another follow up visit in two months.

During his deposition, Centeno agreed that as of March 2011 and based on his age, specialists at UIC recommended conservative treatment until the need for surgery was unavoidable. (Dkt. 137-4 at 38-40.)[2] An outside healthcare professional (Dr. Chmell) first recommended surgery at the end of 2012, at some point between October and December. (*Id.* at 50-51.) Centeno had a total knee replacement (also known as a total knee arthoplasty) on his left knee in February 2013.

Following the surgery, and as of the time of his deposition in August 2013, Centeno received physical therapy through Stateville twice a week for 90 minutes per session. He also performed exercises recommended by his therapist. Although recovery will "take time," Centeno

---

[2] Centeno asks the court to exclude his deposition in its entirety because he did not have an opportunity to review it for transcription errors. (Dkt. 141 at 13.) The court will consider the deposition as Centeno has not identified any purported transcription errors that are material.

8

believes that his knee is "getting there." (*Id.* at 16.) Centeno took narcotic pain medication for approximately three months following his surgery, and then decided to discontinue it because he was concerned about the long-term use of potentially addictive drugs.

### 4. Pre-Surgery Pain Management

Centeno claims that he did not receive prescribed medications to manage his knee pain prior to his surgery. First, Centeno asserts that the defendants did not ensure that he received an injection in his knee to manage pain as suggested by the UIC doctors. In support, Centeno directs the court's attention to an unlabeled page from a monthly planner that the court assumes he used to keep track of his appointments. (Dkt. 141, Ex. 17.) Although the handwritten entries are difficult to read, none of them appear to relate to an injection.

Second, Centeno asserts that the defendants failed to provide him with oral pain medication. Specifically, he points to a group of what appear to be photocopies of prescription receipts, some of which have handwritten notations on them. (Dkt. 141, Ex. 18.) According to Centeno, he never received any of the prescribed medications. Most of the prescriptions are for medication used to manage cholesterol or are labeled as relating to an elbow issue. A single prescription for Ibuprofen (a nonsteroidal anti-inflammatory drug) is dated April 1, 2010, and could relate to Centeno's knee.

The defendants have attached a group of prescription orders to their reply memorandum in support of their motion for summary judgment. It is improper to present new evidence in reply. *See Developers Sur. and Indem. Co. v. Kipling Homes, L.L.C.*, No. 11 C 4457, 2013 WL 315960, at *3 (N.D. Ill. Jan. 28, 2013) (holding that Local Rule 56.1 "does not permit a moving party to argue facts in reply to the opposing party's facts or arguments when those facts are not

included in the moving party's Local Rule 56.1(a) Statement"). Instead, the moving party bears "the initial burden of identifying the basis for seeking summary judgment." *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011). That party is limited to the grounds he chooses to raise in his opening memorandum and may not expand those grounds in reply. *See id.*

By submitting new evidence in reply, the defendants prevented Centeno from responding to the new evidence and arguments based on that evidence. This is clearly prejudicial to Centeno and violates both the letter and spirit of Local Rule 56.1. *See Developers Sur. and Indem. Co.*, 2013 WL 315960, at *3 (the prohibition against expanding the record in reply is meant to ensure that the party opposing summary judgment has an opportunity to respond to the movant's facts and arguments and, if he can, controvert them); *see also Thomas v. Arrow Fin. Serv., LLC*, No. 05 C 5699, 2006 WL 2438346, at *6 n.1 (N.D. Ill. Aug. 17, 2006) ("It is well-settled that raising an issue for the first time in reply is improper, as it deprives the opposing party of a meaningful chance to respond."). Thus, the court will disregard the exhibit to the defendants' reply and the portions of the reply that address this evidence. The court notes, however, that the value of the new evidence is limited, as the existence of prescription orders does not establish that Centeno actually received the associated prescription medications.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining summary judgment motions, "facts must be viewed in the light

most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255 (quotation omitted). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003). Thus, "[t]he mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion," as a "nonmovant will successfully oppose summary judgment only when [he] presents definite, competent evidence to rebut the motion." *Hanover Ins. Co. v. Northern Bldg. Co.*, 751 F.3d 788, 795 (7th Cir. 2014) (internal quotations and citations omitted).

## DISCUSSION

For the following reasons, the settlement of the 2008 lawsuit does not bar this lawsuit. Nevertheless, the defendants are entitled to summary judgment as Centeno's claims against Dr. Zhang and Dr. Carter are dismissed for failure to exhaust, his claims against Dr. Ghosh and Wexford fail on the merits, and his claim against Dr. Funk is unavailing because it is derivative of the unavailing claims against Dr. Ghosh and Wexford.

**A.     Res Judicata**

The doctrine of res judicata (also known as claim preclusion) bars relitigation of the same claim in a second lawsuit. *Prestwick Capital Mgmt., Ltd. v. Peregrine Fin. Grp.*, 727 F.3d 646,

649 n.1 (7th Cir. 2013). One of the required elements for res judicata is identity of causes of action. *Id.* This turns on "whether the claims comprise the same core of operative facts that give rise to a remedy." *Id.* (internal quotation marks omitted). This standard is met if the claims in the two cases at issue are "based on the same, or nearly the same, factual allegations." *Bernstein v. Bankert*, 733 F.3d 190, 226-27 (7th Cir. 2013).

Both this case and Centeno's 2008 case arose from care provided for Centeno's left knee. In the 2008 case, Centeno claimed that in 2006, 2007, and 2008, orthopedic specialists told him that he needed knee surgery. (Dkt. 137-7 at 4.) He also alleged that the defendants failed to provide him with a prescription knee brace or appropriate pain medication. (*Id.*) On June 17, 2009, Centeno settled the 2008 case. The release in that case covered "any past or future injuries or claims of injuries known or unknown to [Centeno's] left knee which arose or could have arisen from the subject matter of **08 CV 2756**, currently pending in the United States District Court for the Northern District of Illinois." (Dkt. 137-8 at 1) (emphasis in original.)

Centeno first asserts that the defendants should not be allowed to rely on the release because it contains a confidentiality provision. According to Centeno, the defendants forfeited their right to raise the defense of res judicata based on the release by filing the settlement agreement on the public docket. Any claim based on an alleged violation of a term in the release, however, must be made in the 2008 case.

With respect to the merits of the defendants' arguments about res judicata, as this court recognized when ruling on the defendants' motion to dismiss based on this issue, under Illinois law, a dismissal based on a court-approved settlement operates as a final adjudication on the merits with respect to any issues that were raised or might have been raised in the first case. *See*

12

*Hernandez ex rel. Gonzalez v. Tapia*, No. 10 C 4124, 2010 WL 5232942, *7 (N.D. Ill. Dec. 15, 2010). The record demonstrates that Centeno's knee deteriorated over time, leading to his eventual surgery in February 2013. This lawsuit, as Centeno explained at his deposition, is based on changes in the condition of his left knee that post-date the June 17, 2009 release signed in the 2008 case. (Dkt. 137-4 at 40-41.)

The court finds that the plain language of the release bars known or unknown claims based on the condition of Centeno's knee as of the date he signed the release in the 2008 case. *See Cannon v. Burge*, 752 F.3d 1079, 1091-92 (7th Cir. 2014) (holding that a release covering known or unknown claims barred a second suit based on the same underlying conduct). This conclusion is supported by the language of the release, which is limited to claims that "arose or could have arisen from the subject matter of 08 CV 2756." The subject matter of the 2008 case was the treatment of Centeno's left knee based on its condition up to and including the date of the release. It was not about the constitutionality of future treatment of Centeno's left knee based on post-release changes inside that knee that resulted in a fundamentally different medical condition. *See Darvosh v. Lewis*, No. 13 C 4727, 2014 WL 4477363, *3-4 (N.D. Ill. Sept. 5, 2014) (discussing scope of a release of all claims that are the subject of a specific case).

Given the changes in Centeno's left knee following execution of the release in the 2008 case, the claims in the 2008 case and this case rest on different factual allegations. *See Bernstein*, 733 F.3d at 226-27. This case is a continuation of the 2008 lawsuit only in the sense that both cases involve Centeno's left knee. The court also adheres to its prior order rejecting the defendants' request to construe the settlement agreement in the 2008 case against a pro se inmate in such a way as to foreclose any right to challenge subsequent medical care based on a new

13

medical issue. Accordingly, the defendants' motion for summary judgment based on res judicata is denied.

## B.    Exhaustion (Dr. Zhang and Dr. Carter)

To give corrections officials an opportunity to address complaints internally before a federal suit is initiated, prisoners must exhaust their administrative remedies before they file suit in federal court. 42 U.S.C. § 1997(e)(a); *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). The exhaustion requirement applies to deliberate indifference claims. *Porter*, 534 U.S. at 532. The defendants bear the burden of proving that a prisoner failed to exhaust a claim. *Turley v. Rednour*, 729 F.3d 645, 649-50 (7th Cir. 2013). Moreover, exhaustion is a precondition to filing a federal lawsuit, so an attempt to exhaust while a lawsuit is pending is insufficient. *See Jones v. Bock*, 549 U.S. 199, 223 (2007); *see also Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004).

To exhaust administrative remedies, a prisoner "must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). As the first step in the process, an inmate must submit a grievance within sixty days after he discovers an alleged problem. *See* 20 Ill. Admin. Code § 504.810(a); *Roberts v. Neal*, 745 F.3d 232, 235 (7th Cir. 2014). Dr. Zhang and Dr. Carter contend that Centeno failed to do so.

Centeno disagrees, pointing to an October 7, 2011, grievance complaining about Dr. Carter's treatment. (Dkt. 141, Ex. 9). This is insufficient, as it post-dates the complaint; the entire exhaustion process must be completed before an inmate may file a federal lawsuit. *See Jones*, 549 U.S. at 223; *Ford*, 362 F.3d at 398. With respect to Dr. Zhang, Centeno cites generally to the first amended complaint in the 2008 case. According to Centeno, this document

shows that Dr. Zhang was aware of his complaints about the treatment provided for his knee pain. This, too, is insufficient as Centeno cannot rely on a grievance underlying a prior complaint to exhaust his administrative remedies in connection with allegedly new wrongs raised in a new case. Moreover, for res judicata purposes, Centeno argues that his "present case, 11 C 0700, is completely, totally, different from previous complaint." (Dkt. 141 at 2.) He cannot have it both ways: if this case is different from the 2008 case, a grievance underlying the claims in the 2008 case cannot exhaust administrative remedies in this case.

The other possible grievance that might serve as the first step in the process necessary to exhaust Centeno's present claims against Dr. Zhang is referenced in the second amended complaint filed in this case. According to Centeno, he sent a "Memorandum dated 4/22/09 . . . to grievance office in line with the denial of the Health Care Unit[']s medical director and administrator[']s lies, that [Dr. Zhang] had reviewed [his] medical record and that [he] had received proper care, yet, [he] is still being deprived adequate medical care." (Dkt. 69 at 10.) This grievance pre-dates the release Centeno signed in the 2008 case. Thus, the release in the 2008 case bars any claims based on this grievance. Accordingly, the claims against Dr. Carter and Dr. Zhang are dismissed for failure to exhaust.

## C.   Deliberate Indifference (Dr. Ghosh and Wexford)

Centeno alleges that Dr. Ghosh and Wexford were deliberately indifferent in connection with care provided for his left knee. The parties' filings largely discuss all of the defendants collectively. They only rarely attempt to parse out what each defendant did or analyze those actions separately. Moreover, the defendants (and, therefore, Centeno, who understandably responded to the arguments as framed by the defendants) conflate the medical professionals

employed by Wexford with Wexford itself, even though different standards govern Centeno's claims against individual defendants and Wexford. With this in mind, the court turns to the parties' arguments.

### 1. Dr. Ghosh

Correctional officials may not act with deliberate indifference to an inmate's serious medical needs. *See, e.g., Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Pittman ex rel. Hamilton v. Cnty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014). Deliberate indifference has an objective and a subjective element: the inmate must have an objectively serious medical condition, and the defendant must be subjectively aware of and consciously disregard the inmate's medical need. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

A medical need is objectively serious when "the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (quoting *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)). The defendants do not dispute that the issues with Centeno's left knee rose to the level of an objectively serious medical need.

With respect to the subjective component of the deliberate indifference test, a plaintiff must allege that the defendant in question was aware of and consciously disregarded his medical need. *See Farmer*, 511 U.S. at 837; *Estelle*, 429 U.S. at 103-04. "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). In other words, "[d]eliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (internal citations omitted). In

analyzing deliberate indifference claims, the court examines the totality of an inmate's medical care. *See, e.g., Walker v. Peters*, 233 F. 3d 494, 501 (7th Cir. 2002); *Smith v. Alvarez*, No. 11 C 0190, 2012 WL 4888480, *7 (N.D. Ill. Oct. 15, 2012) (Bucklo, J.).

Instead, deliberate indifference is comparable to criminal recklessness. *Farmer*, 511 U.S. at 837. It encompasses conduct such as the refusal of effective treatment, *see Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011), or erroneous treatment based on a substantial departure from accepted medical judgment, practice, or standards, *see Roe*, 631 F.3d at 857. Neither medical malpractice nor a mere disagreement with a doctor's medical judgment, however, amounts to deliberate indifference. *See Holloway*, 700 F.3d at 1073; *see also King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) ("Negligence – even gross negligence – is insufficient to meet this standard").

Centeno's claim about the treatment Dr. Ghosh provided has two components. First, Centeno asserts that he should have received surgery sooner and that the delay caused him to suffer unnecessarily. Second, he contends that he did not receive a knee brace or prescribed pain medication and nutritional supplements before his surgery.

### a.    Centeno's Knee Replacement Surgery

With respect to the decision about the appropriateness of knee replacement surgery, Centeno was not limited to receiving care from medical staff at Stateville. Instead, following the settlement of the 2008 case, which among other things resulted in Centeno's receipt of a DonJoy knee brace, Centeno presented at the Stateville healthcare unit in January 2011. Dr. Ghosh ordered a left knee X-ray (which Centeno received that day) and authorized an evaluation at UIC. Centeno had a series of additional appointments with Stateville staff as well as UIC physicians.

17

Critically, as of March 2011, specialists at UIC recommended conservative treatment until the need for surgery was unavoidable, given Centeno's age. The first time an outside healthcare professional (Dr. Chmell) recommended surgery was at the end of 2012. Centeno had knee replacement surgery shortly thereafter, in February 2013.

Prisoners are entitled to "adequate medical care," not "unqualified access to healthcare." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (internal quotations omitted). There is no single appropriate way to practice medicine in prison. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). Thus, medical professionals may choose from "a range of acceptable courses based on prevailing standards in the field." *Id.* Only treatment decisions that are "'such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment'" can support a finding of deliberate indifference. *Holloway*, 700 F.3d at 1073 (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)). In other words, a prisoner is not entitled to receive the treatment of his choice on demand.

Centeno believes that he should have received knee replacement surgery sooner than he did. This is not, however, a situation where a prison doctor ignored complaints of pain or did not consult with an appropriate specialist. When Centeno complained about his knee in 2011, Dr. Ghosh ordered a left knee X-ray, which showed that Centeno had minimal degenerative joint disease. He also authorized an evaluation at UIC and Stateville physicians continued to monitor Centeno. During a series of appointments at UIC, Centeno repeatedly expressed his preference for immediate knee surgery instead of conservative treatment. The UIC doctors nevertheless recommended conservative treatment and monitored what turned out to be ongoing deterioration

in Centeno's knee using imaging tests (MRI studies and X-rays) and physical examinations. Ultimately, they decided that the changes in Centeno's left knee over time merited knee replacement surgery. After they made that decision, within approximately two months, Centeno received the recommended surgery, as well as physical therapy.

Dr. Ghosh's course of treatment was not obviously ineffective given that Stateville medical staff arranged for continuing specialized orthopedic care for Centeno. *See Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir.1996) ("What we have here is not deliberate indifference to a serious medical need, but a deliberate decision by a doctor to treat a medical need in a particular manner"). Moreover, no evidence in the record suggests that Dr. Ghosh had any reason to question whether the UIC orthopedic specialists' recommendations regarding treatment of Centeno's knee were medically appropriate. Although Centeno is dissatisfied with those recommendations (except for the final recommendation of surgery based on changes in his knee), Dr. Ghosh was entitled to rely on them. *Contrast Gil v. Reed*, 381 F.3d 649 (7th Cir. 2004) (concluding that an issue of material fact about deliberate indifference existed where a prison physician prescribed Tylenol III to an inmate even though it was contraindicated and against a specialist's explicit orders because of potential side effects); *see also Collins v. Lochard*, No. 11-CV-3086, 2013 WL 84898 (C.D. Ill. Jan. 7, 2013) (granting summary judgment against an inmate who complained about the treatment provided for an eye condition when the jail physician reasonably relied on an optometrist's diagnosis and recommendations).

This conclusion is not affected by Centeno's claim that in February 2011, UIC orthopedist Dr. Chmell stated that he would not recommend surgery due to concerns about Centeno's ability to receive physical therapy afterwards at Stateville. On the same date, Dr.

Chmell opined that a reconstructive knee replacement at that time was not indicated based on existing images of Centeno's knee, but ordered new X-rays to determine if surgery was warranted based on the current condition of Centeno's knee. Even if Dr. Chmell voiced concerns about physical therapy at Stateville (an issue which the court need not and cannot reach at this stage in the proceedings), it is clear that as of the date of the alleged comment, Dr. Chmell believed that updated X-rays were necessary before he could reach a conclusion about treatment. Dr. Chmell's alleged remark, in the context of discussing further testing and possible future treatment depending on test results, does not show that Dr. Ghosh's reliance on Dr. Chmell's opinion regarding the inappropriateness of surgery at that time amounted to deliberate indifference. *See Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) ("To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment").

### b. Pre-Surgery Knee Brace, Pain Medication, and Nutritional Supplements

Centeno criticizes the delay in providing him with a DonJoy knee brace. He also asserts that he did not receive prescribed pain medication or nutritional supplements (glucosamine and chondroitin sulfate) before his surgery. As indicated by a September 23, 2009, email from counsel in the 2008 case, Centeno received a DonJoy knee brace in 2009 pursuant to the settlement of the 2008 case. (Dkt. 141, Ex. 8.) He may not use this case to relitigate the timing of his receipt of that knee brace.

It is unclear if Centeno exhausted his claim that Dr. Ghosh refused to provide him with pain medication and nutritional supplements as prescribed by UIC doctors. The defendants, however, bear the burden of proving that a prisoner failed to exhaust. *See Turley v. Rednour*, 729 F.3d 645, 649-50 (7th Cir. 2013) (citing *Jones v. Bock*, 549 U.S. 199, 204-05 (2007)). As they have failed to do so, the court reaches the merits of this claim.

Dr. Ghosh contends that Centeno received appropriate pre-surgery pain medication, such as nonsteroidal anti-inflammatory drugs and analgesic balms, in response to any complaints of pain. Centeno does not dispute that on September 26, 2011, he told Stateville medical staff that he did not want any pain medication and, instead, had requested an appointment so he could inquire about the status of his appointment for an outside consultation. Centeno does, however, challenge the defendants' reliance on the fact that he decided to stop taking pain medicine post-surgery because he was concerned about long-term use of a potentially addictive drugs, arguing that this is irrelevant to whether he received pre-surgery pain medication.

The court agrees that Centeno's pre-surgery (not post-surgery) medication is at issue, but concludes that Centeno has failed to establish a triable claim on this point. As noted above, to withstand summary judgment, Centeno must point to specific facts supporting his claim that he did not receive prescribed medication to support the argument that the lack of medication rose to the level of deliberate indifference. *See Payne*, 337 F.3d at 773; *Hanover*, 751 F.3d at 795. Although he is proceeding pro se, Centeno has provided a detailed, correct summary of the applicable law. In addition, for the most part, he clearly has articulated the basis for his claims and explained why he believes that the defendants violated his constitutional rights. With respect to his claim that he did not receive prescribed pain medication, however, he repeatedly makes

sweeping statements and legal conclusions that do not alert the court to the date when he allegedly did not receive medication, the circumstances surrounding the alleged refusal to fill prescriptions, or whether Dr. Ghosh had any personal involvement in allegedly refusing to fill prescriptions.[3] Without even basic information about the allegedly unfilled prescriptions, Centeno cannot survive summary judgment on the prescription pain medication portion of his deliberate indifference claim against Dr. Ghosh.

This leaves Centeno's claim that he did not receive glucosamine and chondroitin sulfate, as recommended by UIC doctors. Although Centeno groups these nutritional supplements in with his claim about pain medication, the record suggests that these substances may arguably support healthy cartilage and may benefit patients with osteoarthritis. It is unclear if Dr. Ghosh was involved in the chain of events that led to Centeno not receiving the nutritional supplements. In any event, as noted above, prisoners are entitled to adequate – not optimal – healthcare. *Holloway*, 700 F.3d at 1073 ("Surely [the plaintiff] would have preferred to have been treated by a doctor who would have prescribed Oxycontin to treat his chronic pain rather than the nonnarcotic substitutes, but a prisoner is not entitled to receive unqualified access to healthcare.") (internal quotations omitted).

---

[3] Specifically, in his response to the motion for summary judgment, Centeno states, "And although defendant[s] were deferring plaintiff to Orthopedic experts, defendant[s] continued the pattern of not adhering to plaintiff's prescribed treatment; even denying NSAID[]s and other pain management prescription as Glucosamine and Chondroitin sulfate, thus deviating from medical prescribed treatment given to plaintiff . . . . These defendant[s] stood by idly for years while plaintiff's condition worsened and pain became unbearable and caused plaintiff permanent damage to his left knee (Degenerative Joint Disease, Osteoarthritis) and refused to explore any alternatives to prescribed pain medication, they just chose to let plaintiff suffer." (Dkt. 141 at 7-8.) He also states, "Plaintiff just wanted pain medicine that was prescribed to him to relieve the pain he was in, but defendant[]s chose to deny him medically prescribed pain management." (*Id.*)

In addition, to demonstrate that Dr. Ghosh acted with a "sufficiently culpable state of mind," Centeno must put identify evidence showing that Dr. Ghosh knew of a serious risk to his health and consciously disregarded that risk. *Id.* Nothing in the record shows that the failure to provide Centeno with over-the-counter nutritional supplements posed a serious risk to Centeno's health. *See Keene v. Chief Medical Officer*, No. CIVS070206 FCDGGHP, 2009 WL 1517760, at *11 (E.D. Cal. June 1, 2009) (jail doctor who failed to ensure that prisoner with chronic back pain received prescribed glucosamine was not deliberately indifferent because "it does not appear that the glucosamine would necessarily have relieved plaintiff's pain, which is the gravamen of this action"). Indeed, the literature cited by Centeno acknowledges that there is disagreement in the scientific community about the efficacy and long-term safety of both glucosamine and chondroitin sulfate. (Dkt. 141, Ex. 5 ("Critics say none of the studies to date have shown any long-term benefits of glucosamine sulfate, either for relieving symptoms or for preventing further deterioration of the cartilage and the joints") and 6 ("So far, however, there is little scientific evidence that [chondroitin sulfate] has any real therapeutic effect"); *see also* http://www.webmd. com/arthritis/tc/glucosamine- and- chondroitin-topic-overview (accessed October 7, 2014).] Irrespective of whether Plaintiff's knee condition was "serious," he has failed to demonstrate that he had a serious need for a glucosamine chondroitin supplement.

Finally, assuming that Dr. Ghosh was involved with the decision to deny glucosamine and chondroitin sulfate to Centeno, nothing in the record suggests that a physician such as Dr. Ghosh was unqualified to determine if nutritional supplements were medically necessary after an orthopedic doctor indicated that they could be beneficial. Moreover, Centeno has not identified any evidence demonstrating that Dr. Ghosh's purported position about glucosamine and

chondroitin sulfate substantially departed from accepted professional standards. *See Holloway*, 700 F.3d at 1073. For all of these reasons, Dr. Ghosh is entitled to summary judgment.

## 2. Wexford

Wexford cannot be found liable based on the actions of staff it employs, as "[r]espondeat superior liability [which makes employers liable for the actions of their employees that are within the scope of their employment] does not apply to private corporations under § 1983." *Shields v. Ill. Dep't. of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). Instead, a plaintiff can establish that Wexford is liable under § 1983 by offering "evidence that his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy." *Id.* at 796.

The defendants' motion for summary judgment does not address Centeno's claim against Wexford. In his second amended complaint, Centeno alleges that Wexford schedules appointments to see specialists but that nothing was being done to obtain an orthopedic consult for his knee condition. (Dkt. 69 at 11.) He also alleges that Wexford has "the authority to make things happen in regards to providing plaintiff with the necessary surgery and post-op physical therapy that the plaintiff is going to need provided he receives this medical care that he's in so much need of." (*Id.* at 12.)

The allegation that Wexford (or, more accurately, an unknown Wexford employee) prevented Centeno from receiving care from a specialist is contradicted by the record, which lists a series of orthopedic consults at UIC that ultimately resulted in a total knee replacement operation. More broadly, Centeno's complaints about the treatment provided for his knee are directed at Wexford employees. Thus, they are based on respondeat superior, which is not a

24

viable theory in a § 1983 action. *Shields*, 746 F.3d at 789. Thus, Wexford is entitled to summary judgment.

## D.    Failure to Respond to Letters (Dr. Funk)

Dr. Funk was the regional medical director at Wexford at the relevant time. Dr. Funk never evaluated Centeno, so Centeno never filed a grievance complaining about care provided by Dr. Funk. Centeno, however, wrote Dr. Funk on August 17, 2010, to complain about Dr. Ghosh's care and the decision to deny authorization for knee replacement surgery. (Dkt. 141 at Ex. 19) ("It is well documented that I need surgeries to correct the instability of my knee. So, I hope that you will do the right thing and allow me to receive this meaningful and necessary care").

Dr. Funk argues that "letters which Dr. Funk was cced on from other individuals" are insufficient to show that he had any personal involvement in Centeno's care. (Dkt. 142, Defs.' Reply, at 5.) This argument is unavailing because the record contains the August 17, 2010, letter from Centeno written directly to Dr. Funk. (Dkt. 141, Ex. 19.)

Alternatively, Dr. Funk asserts that letters that Centeno copied to him showed that Centeno was receiving care. Dr. Funk reasons that Centeno was, at best, merely dissatisfied with the care he was receiving so he cannot be liable because he was not "aware of specific constitutional violations" and had no direct involvement in Centeno's care. (Dkt. 142, Defs.' Reply, at 6.) Dr. Funk may be liable if he ignored Centeno's complaint letters and thereby condoned a lack of medically appropriate treatment. *See Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (a supervisory official may be personally liable if he participated in, directed, condoned, or turned a blind eye to the constitutional violation); *Backes v. Vill. of*

*Peoria Heights, Ill.*, 662 F.3d 866, 870 (7th Cir. 2011) (same). He can also be liable for the actions of subordinates if he is aware of a subordinate's unconstitutional actions and failed to prevent a recurrence of those actions. *Backes*, 662 F.3d at 870.

The defendants' submissions do not engage with these principles. Nevertheless, for the reasons discussed above, Centeno has failed to survive summary judgment regarding his constitutional claims about the treatment he received for his knee. Because there is no underlying constitutional violation to remedy, Dr. Funk cannot be liable for failing to act after Centeno criticized the care he received. *See George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007). Thus, Centeno's claims against Dr. Funk fail.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment [137] is granted. The Clerk is directed to enter judgment in favor of the defendants pursuant to Fed. R. Civ. P. 56. The case is terminated.

If Centeno wishes to appeal this final judgment, he may file a notice of appeal with this court within thirty days of the entry of judgment. Fed. R. App. P. 4(a)(1)(A). A motion for leave to appeal *in forma pauperis* should set forth the issues Centeno plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If Centeno does choose to appeal, he will be liable for the $505 appellate filing fee irrespective of the outcome of the appeal. *Evans v. Illinois Dept. of Corrections*, 150 F.3d 810, 812 (7th Cir. 1998). Furthermore, if the appeal is found to be non-meritorious, the Court of Appeals may assess a "strike" under 28 U.S.C. § 1915(g). Centeno is warned that if a prisoner has had a total of three federal cases or appeals dismissed as frivolous,

malicious, or failing to state a claim, he may not file suit in federal court without prepaying the

filing fee unless he is in imminent danger of serious physical injury. 28 U.S.C. § 1915(g).


ENTER:

James B. Zagel
United States District Court Judge

DATE: 10/16/14